**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ELENA M BYERS, | ) |
| | ) Case No. 1:19-cv-2814 |
| Plaintiff, | ) |
| | ) JUDGE PATRICIA A. GAUGHAN |
| vs. | ) |
| | ) MAGISTRATE JUDGE |
| ANDREW SAUL, Commissioner | ) CARMEN E. HENDERSON |
| of Social Security | ) |
| | ) REPORT AND RECOMMENDATION |
| Defendant. | ) |

## I.      Introduction

Plaintiff, Elena Byers, seeks judicial review of the final decision of the Commissioner of Social Security, Andrew Saul, denying her application for disability-insurance benefits ("DIB") and supplemental-security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Byers's application for SSI be AFFIRMED.

## II.      Procedural History

### A.      The First Decision and *Byers I*

This matter originated on December 2, 2012, when Byers protectively filed an application for a period of DIB and SSI beginning October 22, 2012. (Tr. of Proceedings before the Soc. Sec. Admin., ECF No. 11 at 20). The Ohio Division of Disability Determination (the "State Agency") initially denied her claims on March 26, 2013, and again denied them at the reconsideration stage on May 20, 2013. (ECF No. 11 at 20). Byers timely requested a hearing before an ALJ on June 8, 2013. (ECF No. 11 at 20). ALJ George Roscoe presided over Byers's hearing on December 11,

1

2014. (ECF No. 11 at 20). Byers, who was represented by counsel, appeared and testified. (ECF No. 11 at 20). Deborah Lee, whom the ALJ enlisted as an independent vocational expert for the hearing, also appeared and testified. (ECF No. 11 at 20). The ALJ authored his decision on December 22, 2014 (the "First Decision"). (ECF No. 11 at 20-33). Byers timely requested that the Appeals Council review the First Decision on January 15, 2015. (ECF No. 11 at 13). The Appeals Council denied Byers's request for review on February 23, 2016, stating that they had "found no reason under [their] rules to review" the First Decision. (ECF No. 11 at 8). Thus, the First Decision became final that day. (ECF No. 11 at 8).

Byers appealed the First Decision to this Court on April 25, 2016. *Byers v. Colvin*, 1:16-cv-00983-JRA (N.D. Ohio) (hereinafter *Byers I*), ECF No. 1. Byers briefed the Court on September 12, 2016. (*Byers I*, at ECF No. 15). The Commissioner did not brief the Court; instead, Byers and the Commissioner jointly moved the Court to remand the case to the Commissioner because the ALJ had failed to "develop the administrative record as necessary to determine … whether [Byers] is disabled…" (ECF No. 11 at 872). On November 30, 2016, the Court ordered the Commissioner to hold "further proceedings and [issue] a new disability determination…" (ECF No. 11 at 872).

B.      The Appeals Council's Order

The Appeals Council vacated the First Decision and remanded the case to an ALJ on January 18, 2018, to resolve the following issue:

> The [ALJ] gave 'great weight to the State [A]gency psychological consultants' opinions' of Drs. Souder and Voyten and stated these opinions 'are the basis for the limitations described in this decision' (Decision, page 10). However, the [ALJ] did not include all their limitations in the residual functional capacity assessment or discuss specific reasons or factors for not adopting all their limitations.
>
> Drs. Souder and Voyten opined that the claimant could complete simple, routine work that did not require a fast pace or strict productivity; and would require occasional flexibility in scheduling

rest breaks and work tasks within a normal workday/workweek so that she could manage symptoms and maintain focus (Exhibits 3A/10 and 7A/10).

The residual functional capacity does not reflect the claimant's need for occasional flexibility in scheduling rest breaks and work tasks within a normal workday/workweek to manage symptoms and maintain focus, as assessed by Drs. Souder and Voyten.

Upon remand, the [ALJ] will:

Give further consideration to the nonexamining source opinions pursuant to the provisions of 20 C.F.R. § 404.1527 and § 416.927 and explain the weight given to such opinion evidence.

Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations…

(ECF No. 11 at 909-10). The Appeals Council also stated that

[Byers] filed subsequent claims for Title II and Title XVI disability benefits on June 9, 2016. The Appeals Council's action with respect to the current claims renders the subsequent claims duplicative. Therefore, the [ALJ] will consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims…

[T]he ALJ will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision.

(ECF No. 11 at 910).

C.      The Second Hearing

1.      Byers's Testimony

ALJ Roscoe, who presided over Byers's first hearing and wrote the First Decision, presided over her second disability hearing (the "Second Hearing") on July 3, 2018. (ECF No. 719). Byers again appeared with counsel and testified. (ECF No. 11 at 723-51). During her testimony, Byers struggled emotionally. At one point, the ALJ interrupted Byers to ask her to speak clearly so that

3

the court reporter could accurately transcribe her responses:

> ALJ:        Now, if there is too much crying—
>
> CLMT:      I know.
>
> ALJ:        —we make a—we're making transcripts. If there is too much crying, we can't make a transcript.
>
> CLMT:      Okay. I'm sorry.
>
> ALJ:        So you've got to be able to testify. All they hear— when the transcribers are hearing crying and sniffling, we can't transcribe that.
>
> CLMT:      Okay.
>
> ALJ:        So you're going to have to talk.
>
> CLMT:      Okay.
>
> ALJ:        Okay. Please proceed, counsel.

(ECF No. 11 at 731).

Later, as Byers's counsel inquired about the sexual molestation that Byers experienced as a youth, the ALJ interjected:

> ALJ:        Were criminal charges after filed [*sic*] because of that?
>
> CLMT:      No. My biological father died, and I didn't know you [*sic*] criminally charge your own brother.
>
> ALJ:        Easy. You call the police. Please proceed, counsel.

(ECF No. 11 at 741). Shortly after that, Byers asked for a break:

> [CLMT]:    Can we stop for a minute?
>
> [ATTY]:    I'm sorry?
>
> [CLMT]:    Can we stop for a minute.
>
> ALJ:        One five-minute break. I'm going to start cutting

4

short the testimony. You've had her now for almost 40 minutes. I'm going to start cutting short the testimony. I have another hearing after this.

      CLMT:        Sorry.

      ALJ:        Now, I have accommodated this early hearing. I'm not going to sit here until 3 o'clock in the afternoon. Okay?

      ATTY:        Well, it's important to—

      ALJ:        Yeah. But we're getting into repetitive questions about all the panic attacks in the grocery store, and these panic attacks, and this panic, and this anxiety, and that's all we're talking about. And we haven't even addressed the physical part. I'm going to cut short the testimony.

      ATTY:        Okay. But, Your Honor, the mental impairments are –

      ALJ:        But all you're talking –you're talking about the same mental impairment, the same symptoms. You in essence have been asking the same questions for 40 minutes.

      ATTY:        But it all impacts on – substantially on her –

      ALJ:        But asking the same –

      ATTY:        – ability to function.

      ALJ:        Let me finish. Asking the same question every minute, and every minute, every minute asking this about the anxiety, and this anxiety, and the anxiety and the panic attacks in the grocery store. It must have been at least a dozen questions about going to the grocery store.

      ATTY:        Because –

      ALJ:        I will cut short this testimony. You've got to start – there are some physical issues here, too. I will cut short the testimony. If you don't like it, appeal a second time. Okay? But I'm not going to have –

      ATTY:        I don't want to appeal this case.

      ALJ:        I'm not going to have a two-hour hearing on this case.

      ATTY:        I don't want to appeal a second time, Your Honor.

ALJ:          Okay. Well, then you be more selective in your questions.

(ECF No. 11 at 742-43).

Byers's counsel transitioned to asking Byers about her social interactions—church groups, social clubs, football games, etc. (ECF No. 11 at 744). Counsel's subsequent questions concerned Byers's medical visits, her abilities to focus and concentrate and cope with adapting and managing herself, and her 2015 suicide attempts. (ECF No. 11 at 744-48). Finally, Byers's counsel declared "[a]nyways, last [line of] question[ing] because I know that the [ALJ] is suggesting I'm taking too long here. So let me ask you about your physical impairments…" (ECF No. 11 at 748). Byers's counsel elicited testimony on Byers's physical limitations for about three additional transcript pages. (ECF No. 11 at 748-51).

2.       Burkhammer's Vocational-Expert Testimony

Gene Burkhammer, a licensed clinical counselor, testified at the hearing via telephone as a vocational expert. (ECF No. 11 at 751-55). Byers stipulated to Burkhammer's qualifications. (ECF No. 11 at 751). The ALJ posed a first hypothetical to Burkhammer, which Burkhammer answered. (ECF No. 11 at 752). When the ALJ then asked a second hypothetical, the ALJ and Byers's counsel engaged in the following discourse:

[ALJ]:          For the second hypothetical, please assume the same individual, age, education, work background, and the same residual functional capacity provided to you previously, with the additional limitation that due to symptoms of medically determinable impairments this individual would be off-task at least 20 percent of the time. Could this individual perform jobs existing at significant numbers in the economy?

[VE]:          No. There would be no jobs with that limitation, Your Honor.

ALJ:          Okay. Counsel, you may inquire.

6

[ATTY]:         Okay. If you were to add to the first hypothetical that the individual would need occasional flexibility in scheduling rest breaks and—

ALJ:            Define occasional, counsel.

ATTY:           Up to a third of the day.

ALJ:            Okay.

ATTY:           At random.

ALJ:            So she'd be off-task up to one-third of the day?

ATTY:           Yeah, needing to take breaks.

ALJ:            Okay. Well, that even

ATTY:           Yes.

ALJ:            —exceeds 20 percent, so I'll answer it for him.

ATTY:           Okay.

ALJ:            Anything else?

[ATTY]:         Last question. If the individual will be absent from work at least three days a month, could such a person be competitively employed?

[VE]:           If it's an ongoing problem, I would exclude all work in the economy.

ATTY:           Okay. All right. Thank you. I have no further questions.

(ECF No. 11 at 754-55).

D.      The Second Decision and *Byers II*

The ALJ authored his new opinion on October 17, 2018 (the "Second Decision). (ECF No. 695-709). The ALJ noted this Court's order from *Byers I* and the Appeals Council's order on remand. (ECF No. 11 at 698). The ALJ again denied Byers's petition. (ECF No. 11 at 695). Byers

7

appealed the Second Decision to the Appeals Council, which declined to set aside or modify it on

October 2, 2019. (ECF No. 11 at 688). Byers timely appealed the Second Decision—now

administratively final—to this Court on December 3, 2019 ("*Byers II*"). (ECF No. 1).

## III.    Relevant Background

### A.    Medical Evidence

The ALJ summarized Byers's mental and physical health records as follows:

#### 1.    Physical Impairments

The claimant alleges that she is disabled by her back and joint pain.
Treatment records from Johnny Su, M.D. note that the claimant has
had complaints of polyarthralgias and diffuse myalgias since 2005.
Dr. Su indicated that the claimant's pain symptoms of her joints and
muscles are most consistent with the diagnosis of fibromyalgia
(Exhibits 14F, p. 2; 20F, p. 15; 37F, p. 10). She has evidence of
12/18 tender points (Exhibit 14F, p. 5). She also has symptoms of
fibromyalgia that include fatigue, depression, and anxiety (Exhibits
14F, p. 15; 16F, pp 2-3, 8). In addition, the claimant has testified
that she experiences fogginess. Nevertheless, physical examinations
have consistently noted that the claimant has normal muscle
strength, normal sensation, normal reflexes and normal gait
(Exhibits 3F, pp. 2, 5, 9; 4F, pp. 3, 10, 12; *SF,* p. 58; 16F, p. 3; 37F,
p. 12). There is also cervical spine x-ray in the record dated April 9,
2018, which showed only mild degenerative changes (Exhibit 39F,
p. 3). The evidence indicates that the claimant has been prescribed
Cymbalta and Savella for treatment of her fibromyalgia (Exhibit
16F, p. 34). She was also prescribed exercises and physical therapy.
Initially, she refused to follow this prescribed treatment. However,
the evidence indicates that she eventually attended physical therapy
in April 2018 and completed the program although she winced and
grimaced throughout treatment (Exhibits 37F, p. 13; 38F, p. 2; 40F,
p. 2).

The claimant also has a history of atrial fibrillation (Exhibits 2F, p.
9; 2 IF, p. 17). Nevertheless, treatment records that the claimant has
had a normal EKG, a normal echocardiogram, and normal stress
tests and myocardial perfusion scan (Exhibits 2F, p. 7; *SF,* p. 46; 9F,
pp. 42-43; 28F, p. 39). She also has not had recurrent emergency
room treatments for cardiac symptoms. Furthermore, she has
continued to smoke and is not interested in quitting (Exhibit 8F, p.
10).

The evidence further establishes that the claimant is obese. A treatment record dated June 16, 2014 indicated that the claimant was 5' 5" and weighed 220 pounds and had a BMI of 36.61 (Exhibit 8F, p. 12). On March 23, 2015, she had a BMI of 39.77 (Exhibit 22F, p. 8). The Clinical Guidelines issued by the National Institutes of Health define obesity as present in general where there is a BMI of 30.0 or above and that a BMI of 40 or greater is considered extreme obesity (See also Social Security Ruling 02-lp). Here, the claimant's obesity is an aggravating factor to her fibromyalgia and history of atrial fibrillation and contributes to her limitation to a range of light work.

(ECF No. 11 at 704).

### 2.    Mental Impairments

As noted above, the claimant has also been diagnosed with several mental impairments. Records from Archana Brojmohun, M.D. and the Cleveland Clinic note that the claimant has diagnoses of mood disorder NOS or bipolar disorder, panic disorder with agoraphobia, and ADHD (Exhibits 4F, p. 3; 6F, p. 6; 16F, pp. 3-4; 21F, p. 3). These records indicate that the claimant has irritability and sleep difficulties (Exhibits 27F, p. 2; 33F, p. 2; 35F, p. 6). She has difficulty leaving the house and does not like crowded places (Exhibits 4F, p. 3; 7F). There is also evidence of suicidal ideation and a suicide attempt (Exhibits 21F, p. 6; 27F, p. 9; 33F, p. 5). In addition, the claimant alleges auditory hallucinations. She has stated that she hears a female voice that is critical of her (Exhibit 16F, p. 29; 21F, p. 16; 27F, p. 2). However, the evidence does not indicate that the claimant has ever been diagnosed with psychosis. Moreover, a treatment record dated August 26, 2015 notes that the claimant denied auditory hallucinations (Exhibit 21F, p. 33). Further, the evidence establishes that the claimant's mental status examinations have been generally unremarkable. Mental status examinations have demonstrated that the claimant is oriented to time, place and person with normal eye contact; clear, coherent and spontaneous speech; logical, coherent and rational thoughts that are future oriented; normal perceptions; intact cognition and memory, and intact insight and judgment (Exhibits 16F, pp. 3, 9; 35F, p. 3). The evidence indicates that on January 9, 2013 and February 6, 2013, the claimant's treating physician, Dr. Brojmohun assigned the claimant a GAF of 60, which indicates moderate symptoms. On February 25, 2014, she was assigned a GAF of 70, which indicates mild symptoms (Exhibit 21F, p. 82). Treatment records dated November 19, 2013, May 27, 2014, September 18, 2014, and June 8, 2016 all

note that the claimant was doing well (Exhibits 16F, pp. 8, 24, 49; 21F, p. 75; 26F, p. 2). A treatment record dated September I, 2015 described that claimant's bipolar disorder as stable (Exhibit 21F, p. 17). On October 31, 2016, a treatment record described her bipolar disorder as being in partial remission (Exhibit 32F, p. 10). The evidence indicates that the claimant has been treated over the years for her mental impairments with counseling and medication including Zoloft, Lamictal, Lorazepam, Geodon, Adderall, Valium, and Prazosin (Exhibits 16F, pp. 3-4; 41F, p. 4).

(ECF No. 11 at 704-05).

B.     Opinion Evidence

The ALJ summarized the relevant opinion evidence as follows:

Partial weight is also given to the State Agency mental capacity assessments completed by Janet Souder, Psy.D.[,] dated March 26, 2013 and Karla Voyten, Ph.D.[,] dated May 8, 2013. They found that the claimant can perform simple routine tasks that do[] not require fast pace or strict productivity, which is consistent with the overall evidence. However, they also found that the claimant would require occasional flexibility in scheduling rest breaks and work tasks within a normal workday/workweek so that she can manage symptoms and maintain focus[. B]ut the overall evidence does not establish that the claimant requires such flexibility[,] as mental status examinations in the record have generally been unremarkable in terms of cognition, memory, thought content, perception, insight and judgment. Furthermore, Dr. Souder and Voyten limited the claimant to superficial interaction[,] and[,] as noted above, treatment records suggest that the claimant should not have interaction with the general public as a job requirement since she is not comfortable in crowded or public places (Exhibits IA, 3A, 5A, 7A).

(ECF No. 11 at 705-06).

IV.    **The ALJ's Decision**

As is relevant here, the ALJ issued the following findings of fact:

3.     The claimant has the following severe impairments: panic disorder with agoraphobia; mood disorder; fibromyalgia; obesity; history of attention deficit disorder (ADHD) and history of atrial fibrillation (20 CFR 404.1520(c) and 416.920(c)).

…

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

…

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to hazards (heights, machinery, commercial driving); and mental limitation that she perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontation), and no interaction with the general public as a job requirement (20 CFR 404.1569a and 416.969a).

…

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

…

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

…

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

(ECF No. 11 at 701-07).

11

V.     **Law and Analysis**

A.     Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—"fails to follow its own regulations"—unless the error was

12

harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is harmless

if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.*

And the court will not remand a case for further administrative proceedings absent prejudice on

the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge

between the evidence and the result," then the court cannot uphold the ALJ's decision, even one

supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)

(citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District

Courts follow *Sarchet*'s logical-bridge requirement[1] because it ensures that a claimant will

understand the ALJ's reasoning.

  The Social Security regulations outline a five-step process that the ALJ must use in

determining whether a claimant is entitled to supplemental-security income or disability-insurance

benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment or combination of impairments; (3) if so, whether that

impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404,

Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light

of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience,

she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v);

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the

ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to

---

[1] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

benefits. 20 C.F.R. § 404.1512(a).

      B.    Procedural Due Process

      Byers's first issue—and, really, her entire appeal—concerns a simple premise: The ALJ's conduct during the Second Hearing. Her lead argument alleges that "her counsel was not provided a full and fair opportunity to question the [vocational expert] and, therefore, [Byers's] procedural due process rights under the 5th Amendment to the U.S. Constitution were violated." (ECF No. 14 at 11). More precisely, "Byers contends that … the ALJ cut counsel off and prevented her from asking the [vocational expert] about a material limitation" that was "at the heart of Byers's case," and which went "unaddressed" in the First Decision. (ECF No. 14 at 12). Indeed, Byers asserts that "this case was previously remanded … to address [that] very limitation." (ECF No. 14 at 12). She also criticizes (primarily for context) the ALJ's earlier interruption (which Byers calls an outburst) during Byers's direct testimony. (ECF No. 14 at 14-15 (citing ECF No. 11 at 741-43)).

      In response, the Commissioner asserts that Byers has failed to "show any harm from the ALJ's conduct," arguing that the ALJ's interruption "did not affect [Byers]'s presentation of her case." (ECF No. 16 at 6). The Commissioner notes that the ALJ never cut short Burkhammer's vocational-expert testimony and that Byers, despite her assertions here, was permitted to question the vocational expert until she voluntarily concluded, stating "[o]kay. All right. I have no more questions." (ECF No. 16 at 5 (citing ECF No. 11 at 755)). In any case, the Commissioner points to the proposition that an "'ALJ possesses wide latitude in the conduct of the hearings before him regarding direct and cross-examination, the handling of objections, and arguments of counsel.'" (ECF No. 16 at 5 (quoting *N.L.R.B. v. Baddour*, No. 86-6224, 1988 WL 49075, at *2 (6th Cir. May 19, 1988)). Finally, the Commissioner broadly implies that Byers, by "not alleging any sort of bias or lack of impartiality" by the ALJ (ECF No. 14 at 16), cannot show a procedural due process

violation. (ECF No. 16 at 5 (citing *Schweiker v. McClure*, 456 U.S. 188, 195 (1982)).

"Due process requires that a claimant's hearing be 'fundamentally fair.'" *Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 424-25 (6th Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401–02 (1971)). "Evaluation of a due process claim requires consideration of three factors: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' *Watters*, 530 F. App'x at 425 (quoting *Flatford v. Chater*, 93 F.3d 1296, 1306 (6th Cir.1996)); *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Byers walks the court through the three *Mathews* factors (ECF No. 14 at 12-16). (The Commissioner does not.) For the first factor, Byers asserts that she has a "private interest … in a fair determination of her qualification (or lack thereof) for [DIB] and a meaningful opportunity to present her case." (ECF No. 14 at 12 (citing *Adams v. Massanari*, 55 F. App'x 279, 286 (6th Cir. 2003))). The Court is convinced that this unchallenged assertion has merit. *Watters*, 530 F. App'x at 424-25 ("An applicant for Social Security benefits has a Fifth Amendment property interest in those benefits."); *see also Perales*, 402 U.S. at 401–02 (assuming, rather than holding, that the right at issue here exists).

The second factor—the risk of erroneous deprivation and the probable value of added process—is contested. To address it, the Court must consider whether ALJ denied Byers a full and fair hearing when he interrupted Burkhammer during Burkhammer's vocational-expert testimony. That inquiry raises three nested questions: (1) Is a claimant entitled to vocational expert testimony? (2) What are the Commissioner's self-imposed procedural guidelines in HALLEX (the Hearings,

Appeals and Litigation Law Manual)? and (3) What did the Appeals Council order the ALJ to do on remand?

A claimant is not entitled to a vocational expert at a SSI or DIB hearing. As a general matter, "[a]t [a] hearing, the administrative law judge looks fully into the issues[ and] questions you and the other witnesses[.]… [He] may decide when the evidence will be presented and when the issues will be discussed." 20 C.F.R. § 404.944. Along those lines, the Commissioner "may use the services of a vocational expert or other specialist. [The Commissioner] will decide whether to use a vocational expert or other specialist." 20 C.F.R. § 404.1566(e). Thus, an ALJ can, in certain circumstances, hold a *full and fair* hearing without a vocational expert.

HALLEX does not prohibit the ALJ from interrupting a vocational expert during her testimony. HALLEX, the Commissioner's non-statutory internal manual, "conveys guiding principles, procedural guidance, and information to hearing level and Appeals Council staff." HALLEX I-1-0-1; *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 160 (6th Cir. 2018). Although it is "not binding on this court," HALLEX is persuasive authority—it lays out the Commissioner's efforts to protect claimants' and beneficiaries' due process rights. *See Bowie v. Comm'r of Soc. Sec.*, 593 F.3d 395, 399 (6th Cir. 2008) (noting that, "[w]hile not binding on this court, the procedural guidance to the staff and adjudicators of the Office of Hearings and Appeals set forth in the HALLEX bolsters" the Court's procedural analysis). Concerning vocational-expert testimony, HALLEX states that "[t]he claimant and the representative have the right to question the [vocational expert] fully on any pertinent matter within the [vocational expert]'s area of expertise." HALLEX I-2-6-74(C). HALLEX then states that "the ALJ will determine when [claimants] may exercise this right and whether questions asked or answers given are appropriate." HALLEX I-2-6-74(C). Additionally, the ALJ must control certain aspects of the vocational

16

expert's testimony, for example: compel her to clarify a technical answer; prohibit her from "respond[ing] to questions on medical matters or … draw[ing] conclusions not within [her] area of expertise; prohibit her from examining the claimant; and compel her to clarify any unstated assumptions. HALLEX I-2-6-74(C). All of this sits well with the regulations' general rule governing ALJ actions at hearings, which states that "[t]he administrative law judge may decide when the evidence will be presented and when the issues will be discussed." 20 C.F.R. § 404.944. Thus, the ALJ may—and in some circumstances must—interrupt a vocational expert's testimony.

The Appeals Council's order further narrows the scope of the remand hearing and, necessarily, the Second Decision. The Appeals Council noted that the "residual functional capacity [in the First Decision] d[id] not reflect [Byers]'s need for occasional flexibility in scheduling rest breaks and work tasks within a normal workday/workweek to manage symptoms and maintain focus, as assessed by Drs. Souder and Voyten." (ECF No. 11 at 909). To that end, the Appeals Council ordered the ALJ to consider further: (1) "the nonexamining source opinions pursuant to the provisions of 20 C.F.R. § 404.1527 and § 416.927 and explain the weight given to such opinion evidence"; and (2) Byers's "maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." (ECF No. 11 at 910).

### 1. The Vocational Expert Colloquy

Turing to the primary colloquy at issue, the ALJ permitted Byers's counsel to examine Burkhammer. Byers asked Burkhammer about needing "occasional flexibility in scheduling rest breaks and—," but the ALJ interrupted Byers's question. (ECF No. 11 at 754). The colloquy's text drives the Court's analysis:

ALJ: Define occasional, counsel.

17

| ATTY: | Up to a third of the day. |
|---|---|
| ALJ: | Okay. |
| ATTY: | At random. |
| ALJ: | So she'd be off-task up to one-third of the day? |
| ATTY: | Yeah, needing to take breaks. |
| ALJ: | Okay. Well, that even |
| ATTY: | Yes. |
| ALJ: | —exceeds 20 percent, so I'll answer it for him. |
| ATTY: | Okay. |

(ECF No. 11 at 754-55). The text, in a way, tells a three-act story. First, the ALJ seeks to clarify Byers's counsel's question, so Byers's counsel clarifies it. Second, the ALJ contextualizes the question to further narrow its scope, and Byers's counsel endorses it. Third, the ALJ finally answers the now-clarified and -contextualized question, which Byers's counsel accepts. After being asked if she had further questions, Byers's counsel posed to Burkhammer just one additional question (which is inconsequential here). (ECF No. 11 at 755).

Notably, Byers's counsel did not object to or clarify the ALJ's interpretation of the question during the hearing. (*See* ECF No. 16 at 8). Had Byers's counsel intended something else by her question, then she could have done so then.[2] After all, the ALJ is authorized to "decide when the evidence will be presented and when the issues will be discussed," which—though the hearing is fact-finding (rather than adversarial) in nature—includes ruling on objections. 20 C.F.R. §

---

[2] Byers concedes as much, stating that her "[c]ounsel should have pushed this point further[,] but she did not…" (ECF No. 17 at 2). Although Byers believes that the ALJ "bullied and threatened" her counsel, this point is self-defeating because, as discussed below, Byers also believes that the ALJ did not exhibit prejudice or bias. (ECF No. 14 at 16).

404.944; *see also* HALLEX I-2-6-59(A) (discussing an ALJ's duty to review evidentiary objections).

The hearing transcript demonstrates that the ALJ permitted Byers to question Burkhammer, to clarify an important question and to pose additional questions after the ALJ answered Byers's first question. Byers has not shown how the ALJ's conduct deprived her of an established procedural right when she interrupted Byers and answered the question that Byers had intended for Burkhammer.

### 2. The Byers Colloquy

Byers's secondary concern—the ALJ's conduct during an earlier colloquy with Byers and her counsel—is similarly unpersuasive. In that colloquy, the ALJ initially declared that he would give Byers a five-minute break to compose herself, but the ALJ then stated that he would "start cutting short the testimony" because Byers's counsel had "had her [on the witness stand] for almost 40 minutes." (ECF No. 11 at 742). The ALJ generally criticized Byers's council for "[a]sking the same question every minute, and every minute, [and] every minute…" (ECF No. 11 at 743). Byers responded that "the mental impairments are … [they] all impact[] on—substantially on her … ability to function." (ECF No. 11 at 744). The ALJ urged Byers's council to discuss Byers's physical impairments and limitations, too, then stated: "If you don't like [my decision], appeal a second time. Okay? I'm not going to have … a two-hour hearing on this." (ECF No. 11 at 743). Despite characterizing it as combative, Byers candidly concedes that the ALJ's conduct here does not indicate that he was biased or partial against her. (ECF No. 14 at 16). After all, ALJs are "'imperfect men and women'" who "'sometimes display'" "expressions of impatience and annoyance." (ECF No. 14 at 16 (quoting *Liteky v. United States*, 510 U.S. 540, 555-56 (1994) and citing *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 364 (6th Cir. 2004)).

Looking to the hearing transcript, the ALJ was correct that Byers's counsel had already elicited other testimony on Byers's panic attacks and post-traumatic-stress-disorder triggers. (*E.g.*, ECF No. 11 at 740-41). Although the ALJ exaggerated how much testimony, and for how long Byers's council had been eliciting it, it is immaterial and non-prejudicial because Byers has not pointed to a procedural-due-process error in this colloquy, either. Instead, the record reflects that the ALJ permitted Byers's counsel to continue questioning Byers on other mental impairments and limitations (her social interactions, being alone, her ability to focus, ability to cope and adapt, suicide attempts and ideations) and her physical impairments and limitations (her knee pain, her obesity, her stamina, necessary breaks). (ECF No. 11 at 744-51). Notwithstanding the ALJ's impatience or annoyance, Byers received a full and fair opportunity to develop her own testimony and question the vocational expert until she ran out of questions.[3]

*          *          *

The final *Mathews* factor—the Commissioner's burden to afford additional process—is inconsequential to either colloquy. As Byers explains, she "does not ask the Commissioner to change any procedure or policy"; she asks only for the mere "opportunity to address the case-determinative portion of [the] record with an impartial [vocational expert]." (ECF No. 14 at 16). But, as discussed above, Byers has not shown that the ALJ failed to follow current procedures and policies. Thus, she has already received that opportunity.

Ultimately, Byers has not shown that the ALJ failed to afford her a full and fair hearing.

---

[3] Additionally, Byers has not explained why the hearing's 55-minute duration is prejudicial—or relevant. The most that she musters is a contrast between the time the hearing was scheduled to begin (10:30 a.m., before a scheduling change to 9:35 a.m.) and the hour at which it actually concluded (10:25 a.m.). Although the ALJ brashly warned that he would "cut short the testimony" and that he was "not going to have a two-hour hearing on this case," the record does not indicate that the ALJ deprived Byers of her chance to fully develop her case simply by holding a 55-minute hearing.

20

Additionally, she concedes that the ALJ was not biased and partial during the hearing—a procedural concern that could, on its own, compel remand. *See Wells v. Apfel*, 234 F.3d 1271 (table), No. 99-5548, 2000 WL 1562845, at *5 (6th Cir. Oct. 12, 2000) (noting that "due process requires an impartial decision-maker in judicial and quasi-judicial proceedings"). As such, the *Mathews* factors do not indicate that she is entitled to additional procedural protections, which makes Byers's first issue meritless.

      C.     Souder's and Voyten's Opinions

Byers's second issue repeats the first issue's premise, this time asserting that the ALJ misinterpreted Souder's and Voyten's opinion that Byers would require a flexible work schedule— up to one-third of the time—to take unscheduled breaks. (ECF No. 14 at 17). In this iteration, Byers contends that the ALJ "never weighed in on" the idea that Byers would need scheduling flexibility, rather than simply being off task one-third of the time. (ECF No. 14 at 17). In Byers's opinion, that question was "the basis of the prior remand." (ECF No. 14 at 17). As such, Byers argues that the Second Decision cannot be supported by substantial evidence. (ECF No. 14 at 17).

The Appeals Council's remand order was far broader that what Byers asserts. It stated that:

> Upon remand, the [ALJ] will:
>
> - Give further consideration to the nonexamining source opinions pursuant to the provisions of 20 C.F.R. § 404.1527 and § 416.927 and explain the weight given to such opinion evidence.
>
> - Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations…

21

(ECF No. 11 at 910). The Appeals Council contextualized that order by summarizing the First

Decision's flaw:

> The [ALJ] gave 'great weight to the State [A]gency psychological
> consultants' opinions' of Drs. Souder and Voyten and stated these
> opinions 'are the basis for the limitations described in this decision'
> (Decision, page 10). However, the [ALJ] did not include all their
> limitations in the residual functional capacity assessment or discuss
> specific reasons or factors for not adopting all their limitations.
>
> [Specifically,] Drs. Souder and Voyten opined that the claimant
> could complete simple, routine work that did not require a fast pace
> or strict productivity; and would require occasional flexibility in
> scheduling rest breaks and work tasks within a normal
> workday/workweek so that she could manage symptoms and
> maintain focus…

(ECF No. 11 at 909). The Appeals Council compelled the ALJ to further consider only whether

the medical evidence of record would require Byers to work in a setting with occasional

flexibility in scheduling rest breaks and, regardless of how he viewed the evidence, explain how

he weighed Souder's or Voyten's opinion. (ECF No. 11 at 909-10). It did not compel the ALJ to

summarily adopt the limitation—even though the ALJ had given great weight to the opinions in

the First Decision.

   In the Second Decision, the ALJ satisfied his burden to consider Souder's and Voyten's

opinions and explain the weight given to them. Byers candidly concedes as much, stating that

"[t]he ALJ's decision[,] on its face[,] includes proper consideration of … Souder['s] and …

Voyten's medical opinion[s]." (ECF No. 14 at 17). The then-applicable regulation[4] requires that

the ALJ "evaluate every medical opinion" in the record and weigh it according to the listed

factors. 20 C.F.R. § 404.1527(c); (ECF No. 14 at 16). Although his factors analysis is only

---

   [4] 20 C.F.R. § 404.1527 was prospectively repealed on March 27, 2017. Because this case
was originally filed on December 2, 2012, the regulation controls Byers's case.

implicit,[5] the ALJ met the regulatory burden when he explained that the record evidence did not support a flexibility limitation because he specified that the "mental status examinations in the record have generally been unremarkable in terms of cognition, memory, thought content, perception, insight and judgment." (ECF No. 11 at 705). His conclusion is reasonably drawn from the medical records and Byers's counsel's own assertions.

Byers counters the ALJ's analysis by asserting that the ALJ misinterpreted the limitation at issue; thus, she contends, it cannot be accepted. (ECF No. 14 at 17). But, as detailed above, this argument is unpersuasive because Byers's counsel endorsed the ALJ's interpretation of the limitation during the hearing. Essentially, Byers is attempting to reframe the limitation here. But it is too late. The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125. Even assuming Byers's interpretation (as briefed) more accurately frames Souder's and Voyten's limitation, the ALJ's treatment of the opinion evidence is supported by substantial evidence, and "[t]he decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision." *Elam*, 348 F.3d at 125.

Because Byers fails to demonstrate how the ALJ's decision is not supported by substantial evidence, the ALJ's decision should not be overturned.

---

[5] An ALJ's narrative concerning the weight accorded to opinion evidence can be sufficient even though it is "brief" (*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009)), "indirect[]" (*Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 471 (6th Cir. 2006)), or implied. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.").

D.       The Law-of-the-Case Doctrine

Byers's third issue reframes the premise once more, this time asserting that the ALJ did not "tak[e] actions []consistent with the Appeals Council's remand order"; thus, he "failed to follow the law-of-the-case" doctrine. (ECF No. 14 at 19). Although the ALJ issued a wholly new decision, Byers points to only one allegedly impermissible action—the "concocted" limitation that Byers would be off task one-third of the day. (ECF No. 14 at 19). In response, the Commissioner notes that the ALJ did not fail to follow either this Court's remand order or the Appeals Council's remand order. (ECF No. 16 at 14-16). The Commissioner also argues that the law-of-the-case doctrine does not apply to intra-agency orders, like the Appeals Commission's. (ECF No 16 at 15).

"Under the law-of-the-case doctrine, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002); *see also Quern v. Jordan*, 440 U.S. 332, 347, n. 18 (1979) ("The doctrine of law of the case only comes into play with respect to issues previously determined."). "As a rule, 'on the remand of a case after appeal, it is the duty of the lower court, or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions.'" *Inteso v. Comm'r of Soc. Sec.*, No. 1:16-cv-1893, 2018 WL 571448, at *3 (N.D. Ohio Jan 26, 2018) (quoting *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967)). "[I]f the cause is remanded with specific directions, further proceedings in the trial court or agency from which the appeal is taken must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceedings inconsistent therewith is error." *Mefford*, 383 F.2d at 758. "Deviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) (citing *Mefford*,

24

383 F.2d at 758–759).

Byers specifically asserts that "the ALJ erred by taking actions inconsistent with the *Appeals Council's* remand order." (ECF No. 14 at 19 (emphasis added)). That is the argument's flaw[6]: This Court has generally determined that the law-of-the-case doctrine does not apply to the ALJ's "compliance with the Appeals Council's Order." *Inteso*, 2018 WL 571448, at *4 (adopting, after the plaintiff's objection, the magistrate judge's law-of-the-case-doctrine analysis in *Inteso v. Comm'r of Soc. Sec.*, No. 1:16-cv-1893, 2017 WL 9485668, at *8-9 (N.D. Ohio Oct. 4, 2017)). In *Inteso*, the magistrate judge noted that the claimant "provide[d] no support for her assertion that the law-of-the-case doctrine applies to the Appeals Council decision"; after independently reviewing the case law, he found no support for it, either. *Inteso*, 2017 WL 9485668, at *9. The magistrate judge in *Inteso* quoted a lengthy summary of the legal issue from *Shope v. Comm'r of Soc. Sec. Id.* (quoting No. 2:14–cv–2055, 2015 WL 3823165, at *8 (S.D. Ohio June 19, 2015), report and recommendation adopted, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015)). The magistrate judge in *Shope* first noted that "there is no consensus among federal courts regarding whether an ALJ's failure to follow Appeals Council directives in a remand order may serve as independent grounds for reversal absent other error." *Id.* The magistrate judge in *Shope* then cited to Sixth Circuit courts that had weighed the two positions—for and against jurisdiction—and

---

[6] Indeed, Byers cites to just one case, *Parsons v. Comm'r of Soc. Sec.*, to support her position. (ECF No. 14 at 19 (citing No. 11-cv-1063, 2012 WL 3852927, *3 (N.D. Ohio Sept. 5, 2012)). In *Parsons*, the Court remanded on law-of-the-case-doctrine grounds because the ALJ, in conducting a *de novo* hearing on the claimant's RFC, notably departed from "the plain language of the Court's remand order." *Parsons*, 2012 WL 3852927, at *3. That order, to which the parties stipulated, instructed the ALJ to "hold a supplemental hearing and gather vocational expert testimony *concerning the existence of jobs that accommodate Plaintiff's manipulative limitations*." *Id.* at *1 (emphasis added). Thus, *Parsons* is misapplied here because Byers does not argue that the ALJ failed to follow this Court's remand order—and, in any case, the Court's remand order was far broader than the one in *Parsons*. (*See* ECF No. 11 at 877).

determined that "[t]he overwhelming majority of courts in this circuit … have determined that federal courts lack jurisdiction to consider whether an administrative law judge complied with the Appeals Council's instructions on remand." *Id.* And following that trend, the magistrate judge in *Shope* concluded that "federal courts lack jurisdiction to consider whether an administrative law judge has complied with the Appeals Council's instructions on remand." *Id.* The magistrate judge in *Inteso* agreed, and the district judge in *Inteso* adopted the magistrate judge's recommendation over plaintiff's objection. *Id.*

The Court here agrees with *Inteso*'s and *Shope*'s thorough and well-reasoned analyses. As such, the law-of-the-case doctrine does not compel—or even permit—this Court to review whether the ALJ complied with the Appeals Council's order. And even if the Court could review the Appeals Council's order, Byers's argument would still not persuade the Court because, as discussed in the previous sections, she has not shown that the ALJ deviated from the Appeals Council's order. Accordingly, the law-of-the-case doctrine is an improper mechanism for disturbing the ALJ's decision.

## VI.    Recommendation

Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Byers's application for SSI be AFFIRMED.

DATED: 11/24/2020

*CarmenHenderson*
_____
Carmen E. Henderson
United States Magistrate Judge

_____

## OBJECTIONS
Any objections to this Report and Recommendation must be filed with the Clerk of Courts

within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).